**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| **MARJURITA D. KELLEY, et al.,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | **Case No. 3:16-CV-1015-B-BK** |
| | § | |
| **THE CITY OF DALLAS, et al.,** | § | |
| | § | |
| **Defendants.** | § | |

**FINDINGS, CONCLUSIONS, AND RECOMMENDATION**

Pursuant to District Judge Jane Boyle's *Order Referring Motions*, Doc. 72, *The Defendant City of Dallas's Rule 12(b)(6) Motion to Dismiss the Plaintiffs' Federal Claims Against It in the Plaintiffs' Second Amended Complaint*, Doc. 70, and *The Defendant Kevin Mansell's Rule 12(b)(6) Motion to Dismiss the Plaintiffs' Federal Claims Against Him in the Plaintiffs' Second Amended Complaint*, Doc. 71, were referred to the Magistrate Judge for findings of fact and a recommended disposition. For the reasons that follow, the motions should be **GRANTED** to the extent stated herein.

**I.       BACKGROUND**

In December 2016, Plaintiffs filed their second amended complaint raising various claims against Defendants T-Mobile USA, Inc. and MetroPCS Communications, Inc. (collectively, the "Telecom Defendants")[1], the City of Dallas (the "City"), City Police Officer Kevin Mansell ("Officer Mansell"), and City police dispatcher, Abigail Dominguez ("Dominguez"). Doc. 53. Plaintiffs, who are relatives of D'Lisa Kelley ("D'Lisa"), allege that one night in March 2014,

---

[1] In their motion to dismiss, the Telecom Defendants refer to both corporate entities collectively as T-Mobile. Doc. 66 at 10 n.1.

D'Lisa's sister received a frantic phone call from D'Lisa who was screaming, but the call abruptly ended and D'Lisa did not answer when her sister attempted to call her back. Doc. 53 at 7-8. D'Lisa's sister next received two texts from D'Lisa, but again, her subsequent attempts to reach D'Lisa failed. Doc. 53 at 8. D'Lisa's grandmother, Marjurita Kelley ("Marjurita"), with whom D'Lisa lived, called 9-1-1 for police assistance and spoke with Dominguez. Doc. 53 at 8. Dominguez initially told Marjurita that she would dispatch officers to her home to create a report that D'Lisa was missing. Doc. 53 at 8. Instead, however, Dominguez deviated from policy and alerted her supervisor, Officer Mansell, about the call. Doc. 53 at 9. Officer Mansell instructed Dominguez not to send a police officer out and allegedly made several inappropriate statements about D'Lisa's age, race, gender, and pregnancy. Doc. 53 at 9.

Approximately 30 minutes later, Officer Mansell instructed Dominguez to call Marjurita to obtain D'Lisa's phone number so he could attempt to "ping" her phone. Doc. 53 at 9. After Officer Mansell obtained D'Lisa's number, he informed the Telecom Defendants, D'Lisa's cell phone providers, of the emergency situation and requested that they "ping" D'Lisa's phone to obtain her location information; however, the Telecom Defendants failed to provide D'Lisa's location information. Doc. 53 at 9-10, 19. Officer Mansell then submitted a second "more formal" ping request, but the Telecom Defendants again failed to provide D'Lisa's location information. Doc. 53 at 10. Plaintiffs allege that the Telecom Defendants, in fact, delayed the process further by asking Officer Mansell to send in additional paperwork. Doc. 53 at 10. Officer Mansell did submit the additional paperwork; however, in the meantime, he coded the call in a manner such that no officers would be dispatched until he obtained an accurate ping on D'Lisa's phone. Doc. 53 at 10. Officer Mansell did not follow up by the end of his shift or

thereafter. Doc. 53 at 11. D'Lisa's body was found several days later, and it appeared that she had died after a prolonged period of torture. Doc. 53 at 11-12.

As relevant here, Plaintiffs brings two causes of action against the City and Officer Mansell, both pursuant to 42 U.S.C. § 1983.[2] The first cause is for denial of D'Lisa's substantive due process rights based on (1) Officer Mansell's knowledge of the emergency situation D'Lisa was in and his deliberately indifferent exacerbation of the situation into a "state-created danger"; and (2) the City and Police Chief David Brown's failure to train police officers in how to (a) deal "with an emergency missing person case where imminent harm is threatened," and (b) handle and process 9-1-1 calls and related ping requests. Doc. 53 at 21-23. The latter contention is based on Plaintiffs' allegation that the City and D'Lisa had a "special relationship" *vis-à-vis* her family's attempts to secure help for her through the 9-1-1 emergency system. Doc. 53 at 22.

Plaintiffs' second cause of action alleges that the City violated Plaintiffs' equal protection rights pursuant to its custom, practice, and policy of failing to provide proper emergency assistance to D'Lisa. Doc. 53 at 24. Plaintiffs further claim that the City has a policy, practice, or custom of providing less assistance to female victims who live in high crime and predominantly minority race neighborhoods, and discrimination against such persons was a motivating factor in the City's refusal to prioritize and respond quickly to Marjurita's 9-1-1 call, as opposed to how the call would have been handled if the caller had been a non-minority and/or from a more affluent neighborhood. Doc. 53 at 24-29. Relatedly, Plaintiffs contend that the City has a policy, custom, or practice of providing less assistance to domestic assault victims as

---

[2] Plaintiffs also sued the City under a theory of promissory estoppel, for violations of the Texas Tort Claims Act, intentional infliction of emotional distress, wrongful death, and a survival action and sued the City and Mansell for breach of contract, but the motions to dismiss do not address those claims. *See* Doc. 53 at 31-36, 44-45.

opposed to victims of other types of assault.  Doc. 53 at 25-27.  Plaintiffs also allege, based on their information and belief, that the City has a policy, practice, or custom – in the context of law enforcement – pursuant to which it devotes more money, staffing, and resources to developing and improving 9-1-1 infrastructure in affluent and predominantly white neighborhoods as opposed to minority neighborhoods.  Doc. 53 at 25.

Finally, as a sub-set of Plaintiffs' equal protection claims, they raise a failure-to-train claim, contending that the City failed to implement adequate customs, policies, practices, or procedures, and failed to train its personnel adequately on the appropriate policies, practices, or procedures regarding the handling of 9-1-1 possible domestic violence calls from victims and/or family members which involve imminent danger.  Doc. 53 at 24, 28.  They maintain that this failure to train reflects a deliberate indifference to the rights of the City's inhabitants.  Doc. 53 at 24.

Further, as to Officer Mansell, Plaintiffs contend that he violated Marjurita's equal protection rights when he failed to prioritize her 9-1-1 call and dispatch emergency service based on her race and violated D'Lisa's rights based on her race and gender.  Doc. 53 at 27, 29.  In addition to D'Lisa, Plaintiffs point to two other African-American residents of South Dallas, Deanna Cook and Kelvin Crowe, who they suggest unsuccessfully attempted to obtain 9-1-1 assistance between August 2012 and January 2015.[3]  Doc. 53 at 26.  The City and Officer

---

[3] Ms. Cook, a minority-race, domestic violence victim, was murdered in her home by an intruder despite having called 9-1-1 to report the intruder.  Thereafter, members of her family brought suit against the City, two 9-1-1 call-takers, a call center supervisor, two police officers, a police dispatcher, and several telecommunications companies, raising claims similar to those raised in this case.  *Cook v. T-Mobile USA, Inc*., No. 14-CV-2907-P at Doc. 83, consolidated with *Cook v. City of Dallas*, No. 12-CV-3788-N at Doc. 62. *See Randall D. Wolcott, M.D., P.A. v. Sebelius, 635 F.3d 757, 763 (5th Cir. 2011)* (holding that a court ruling on a Rule 12(b)(6) motion may

Mansell now move to dismiss these claims pursuant to Federal Rule of Civil Procedure 12(b)(6). Doc. 70; Doc. 71.

## II.    APPLICABLE LAW

A plaintiff fails to state a claim for relief under Rule 12(b)(6) when the complaint does not contain "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570 (2007). In order to overcome a Rule 12(b)(6) motion, a plaintiff's complaint should "contain either direct allegations on every material point necessary to sustain a recovery . . . or contain allegations from which an inference may fairly be drawn that evidence on these material points will be introduced at trial." *Campbell v. City of San Antonio,* 43 F.3d 973, 975 (5th Cir. 1995) (quotation omitted). The complaint should not simply contain conclusory allegations, but must be pled with a certain level of factual specificity, and the district court cannot "accept as true conclusory allegations or unwarranted deductions of fact." *Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 498 (5th Cir. 2000) (quotation omitted). Section 1983 "provides a federal cause of action for the deprivation, under color of law, of a citizen's 'rights, privileges, or immunities secured by the Constitution and laws' of the United States." *Livadas v. Bradshaw*, 512 U.S. 107, 132 (1994). To state a claim under section 1983, a plaintiff must allege facts that show he has been deprived of a right secured by the Constitution and the laws of the United States, and the defendants were acting under color of state law. *See Flagg Bros., Inc. v. Brooks*, 436 U.S. 149, 155 (1978). Nevertheless, no heightened pleading standard applies to civil rights claims against municipalities or their employees. *Leatherman v. Tarrant Cty. Narc. Int. & Coord. Unit*, 507 U.S. 163, 168 (1993) (holding that heightened

rely on matters of which a court may take judicial notice). The Court was unable to locate any information about Mr. Crowe of which it could take judicial notice.

pleading standards for civil rights claims against municipalities cannot be squared with the "liberal system of notice pleading set up by the Federal Rules.") (internal quotation marks omitted) (cited approvingly in *Jones v. Bock*, 549 U.S. 199, 212, 224 (2007)); *Schultea v. Wood*, 47 F.3d 1427, 1433-34 (5th Cir. 1995) (*en banc*) (holding that a heightened pleading standard only applies to section 1983 cases after the plaintiff is ordered to submit a Rule 7(a) reply following an individual defendant's assertion of the qualified immunity defense).

## III. ARGUMENTS AND ANALYSIS

### A. Officer Mansell's Motion to Dismiss Plaintiffs' Official Capacity Claims

Officer Mansell argues that the federal claims against him in his official capacity should be dismissed as redundant because they are duplicative of the claims Plaintiffs have brought against the City. Doc. 71 at 12-13. Plaintiffs do not respond to this argument, and "[f]ailure to pursue a claim beyond the initial complaint constitutes abandonment." *Osborn v. Bank of New York Mellon*, No. 3:16-CV-0308-G, 2016 WL 3211771, at *2 (N.D. Tex. May 13, 2016) (Stickney, J.), *adopted by* 2016 WL 3190243 (N.D. Tex. June 7, 2016) (Fish, J.). Consequently, because Plaintiffs have failed to defend the claims they brought against Officer Mansell in his official capacity, said claims should be deemed abandoned and dismissed. *See Black v. North Panola Sch. Dist.*, 461 F.3d 584, 588 n.1 (5th Cir. 2006) (plaintiff abandoned claim where she failed to defend claim in response to defendant's motion to dismiss); *Osborn*, 2016 WL 3211771, at *2 (same).

**B. Substantive Due Process Claims Against the City and Officer Mansell**

*1. Liability Based on a Special Relationship Between the City and D'Lisa[4]*

The City first argues that, due to the absence of a narrowly defined "special relationship" between the government and D'Lisa, the City's failure to protect her from private violence cannot give rise to a due process claim. Doc. 70 at 12-17. In particular, the City asserts that no cause of action will lie for deprivation of a liberty interest because the Constitution imposes no duty upon local governments or their employees to provide members of the general public with adequate protective services. Doc. 70 at 12-17 (citing *DeShaney v. Winnebago Cty. Dep't of Soc. Servs.*, 489 U.S. 189 (1989)).

Plaintiffs respond that they have adequately alleged a "special relationship" because they pleaded that the City was contractually obligated to provide 9-1-1 emergency response services to its residents, including the Plaintiffs who relied on that service, such that their claim falls within the "other similar restraint of personal liberty" prong of the "special relationship" exception. Doc. 80 at 10-12.

The Court of Appeals for the Fifth Circuit has recognized that a special relationship can exist for purposes of due process concerns where the state incarcerates a person, involuntarily commits an individual to an institution, or places a child in foster care. *Doe ex rel. Magee v. Covington Cty. Sch. Dist.*, 675 F.3d 849, 856 (5th Cir. 2012). It is well-settled, however, that under other circumstances, such a relationship does not arise. For example, "a public school does not have a special relationship with a student that would require the school to protect the student from harm at the hands of a private actor." *Id.*; *see also Doe v. Hillsboro Indep. Sch.*

---

[4] Plaintiffs do not raise this theory of liability against Officer Mansell.

7

*Dist.*, 113 F.3d 1412 (5th Cir. 1997) (rejecting a plaintiff's argument that, because school attendance was required by state law, a special relationship existed between a school and a student who was sexually assaulted by a school custodian); *Walton v. Alexander*, 44 F.3d 1297 (5th Cir. 1995) (holding that a residential public school for the deaf did not share a special relationship with a student who was sexually assaulted by another student because the student attended the school voluntarily with the option of leaving at will). Factors such as the student's age, compulsory school attendance laws, and even the affirmative act of placing a student into an abuser's custody do not create a special relationship sufficient to state a constitutional violation under section 1983. *Covington*, 675 F.3d at 858.

The same reasoning applies in this case. The City, by virtue of an alleged contract with Plaintiffs, did not <u>restrain</u> either Plaintiffs or D'Lisa in the exercise of their personal liberty in the narrow sense that the special relationship exception requires. As such, the City did not have a constitutional duty to protect D'Lisa from danger, including private violence. *McClendon v. City of Columbia*, 305 F.3d 314 (5th Cir. 2002) (holding that it is only where a state first creates a special relationship with an individual that it has "a constitutional duty to protect that individual from dangers, including, in certain circumstances, private violence."). Consequently, Plaintiffs' failure to train due process claims based on the special relationship theory must fail.

### 2. *Liability Based on a State-Created Danger*

The City and Officer Mansell next contend that the Court of Appeals for the Fifth Circuit has never recognized the "state-created danger" theory of liability in the due process context. Doc. 70 at 12, 17-19; Doc. 71 at 23-25. Plaintiffs, however, maintain that the viability of their "state-created danger" theory should be addressed at the summary judgment stage and, in any event, the Fifth Circuit has not expressly rejected the theory. Doc. 80 at 12-13; Doc. 81 at 11-13.

8

Under the state-created danger theory, a governmental entity may be held liable under section 1983 if: (1) it used its authority to create a dangerous environment for the plaintiff; and (2) the defendants acted with deliberate indifference to the plight of the plaintiff. *Estate of Lance v. Lewisville Indep. Sch. Dist.*, 743 F.3d 982, 1002 (5th Cir. 2014). Nevertheless, in *Covington* the *en banc* court declined to adopt the theory as the law of this Circuit. *Covington*, 675 F.3d at 865. Subsequent opinions have "repeatedly noted the unavailability of the theory." *Doe v. Columbia-Brazoria Indep. Sch. Dist. by and through Board of Trustees*, 855 F.3d 681 (5th Cir. 2017) (citing *Lance*, 743 F.3d at 1002); *see also Whitley v. Hanna*, 726 F.3d 631, 639 n.5 (5th Cir. 2013) ("[T]his court has not adopted the state-created danger theory, . . . and Whitley wisely has disclaimed reliance on it.") (ellipses in original).

Even if the doctrine was viable, the Court of Appeals for the Fifth Circuit has explicitly "cautioned against finding liability under the state-created danger theory based upon an ineffective policy or practice in cases where the plaintiff's injury is inflicted by a private actor." *Covington*, 675 F.3d at 866. For instance, in *Rivera v. Hous. Indep. Sch. Dist.*, 349 F.3d 244, 250 (5th Cir. 2003), the appellate court rejected a state-created danger claim because, even if the school board was not "assiduous at fighting gang activity," that did not show that the board "affirmatively placed [the victim in a position of danger, namely in the situation where [the assailant] was a greater threat to him than he would have been otherwise." The *Rivera* court further explained that:

> [T]o hold [the school district] responsible for the ultimate ineffectiveness of [its policies designed to combat gang violence] would turn the Due Process Clause's limited duty of care and protection into a guarantee of shelter from private violence. This result would be inimical to the Supreme Court's conclusion [in *DeShaney v. Winnebago Cty. Dept. of Soc. Serv.*, 489 U.S. 189 (1989)] that the Due Process Clause does not require the State to protect individuals from private violence.

*Rivera*, 349 F.3d at 250.

In the instant case, Plaintiffs cannot plausibly allege that either the City or Officer Mansell created a dangerous environment for D'Lisa. *Lance*, 743 F.3d at 1002. Nor is liability warranted where D'Lisa's death was inflicted by a private actor. *Covington*, 675 F.3d at 866. Thus, even if the state-created danger theory were a recognized exception in the Fifth Circuit, it is not applicable on the facts alleged here.

### C. Equal Protection Violation Based on Race and/or Gender[5]

The Equal Protection Clause requires that similarly situated persons be treated alike. *City of Cleburne, Texas v. Cleburne Living Center, Inc.*, 473 U.S. 432, 439 (1985). To state a claim of racial or gender discrimination under the Equal Protection Clause, a plaintiff must allege that she was treated differently than other similarly-situated individuals and that the unequal treatment stemmed from a discriminatory purpose. *See Priester v. Lowndes Cty.*, 354 F.3d 414, 424 (5th Cir. 2004). A discriminatory purpose "implies that the decision maker singled out a particular group for disparate treatment and selected his course of action at least in part for the purpose of causing its adverse effect on an identifiable group." *Taylor v. Johnson*, 257 F.3d 470,

---

[5] As previously noted, one of Plaintiffs' equal protection claims is based on the City's and Officer Mansell's failure to provide proper emergency assistance to D'Lisa due to her status as a victim of domestic violence. See Doc. 53 at 24-27. Plaintiffs allege that the City has a custom of providing less assistance to domestic assault victims than to victims of other types of assaults for no rational reason. Doc. 80 at 21-22, 25-27 (quoting ¶¶ 121-22, 124, 128, 131 of the second amended complaint). As such, Plaintiffs urge that they can support a "class of one" equal protection claim. Doc. 80 at 35-36 (citing ¶¶ 110-138 of the second amended complaint). The United States Court of Appeals for the Fifth Circuit, however, has recognized that the allegation that domestic violence victims were treated differently than other crime victims is a route to proving gender-based discrimination because a disproportionate number of domestic violence victims are women. *See Shipp v. McMahon*, 234 F.3d 907, 914 (5th Cir. 2000), *overruled on other grounds*, *McClendon v. City of Columbia*, 305 F.3d 314 (5th Cir. 2002). Accordingly, the claim is addressed herein as one of gender-based discrimination.

473 (5th Cir. 2001). "[P]urposeful discrimination requires more than 'intent as volition or intent as awareness of consequences.' . . . It instead involves a decisionmaker's undertaking a course of action 'because of,' not merely 'in spite of,' [the action's] adverse effects upon an identifiable group." *Ashcroft v. Iqbal*, 556 U.S. 662, 676-77 (2009) (citation and some internal quotation marks omitted).

### 1. Whether Plaintiffs Plead Facts Permitting an Inference of Discrimination

The City contends that Plaintiffs do not plead any plausible facts permitting a reasonable inference that either Officer Mansell or Dominguez were aware (1) of the race of any of the Plaintiffs (or, presumably, D'Lisa); (2) that Marjurita's 9-1-1 call originated from a predominantly minority-race neighborhood; (3) that D'Lisa was in a predominantly minority-race neighborhood when she was assaulted and killed; or (4) that the assault on D'Lisa was "domestic violence" rather than a random assault. Doc. 70 at 20.

Officer Mansell argues that the only allegations of Plaintiffs' complaint that pertain to him are that he (1) trivialized a call from a potential domestic violence victim (but there are not sufficient facts pled to permit a reasonable inference that D'Lisa was a victim of such violence); (2) spent a short amount of time working the call (but there are not any facts pled that permit a reasonable inference that he would not have acted the same in a similar call situation and, in fact, the complaint alleges that he immediately attempted to get location information from the Telecom Defendants, who could provide none); and (3) made discriminatory statements about D'Lisa's gender and race (but do not specify what those statements were, leaving them a matter of pure speculation). Doc. 71 at 26-28. Officer Mansell maintains that Plaintiffs do not allege any facts permitting a reasonable inference that he was aware that Marjurita's 9-1-1 call came from a particular neighborhood that was "predominantly minority" or that D'Lisa was in such a

neighborhood when she was assaulted, nor do Plaintiffs plead any plausible facts suggesting that D'Lisa distress stemmed from an incidence of domestic violence. Doc. 71 at 28. Officer Mansell contends further that, even if Plaintiffs had plausibly pled such allegations, which may be "consistent with" a claim of discrimination, they are not sufficient to infer that he acted with discriminatory animus. Doc. 71 at 29 (citing *Iqbal*, 556 U.S. at 680-81). Finally, Officer Mansell maintains that Plaintiffs have pleaded no facts from which a reasonable inference can be drawn that he provided Plaintiffs with inferior police protection compared to that which he would have provided to similarly situated persons. Doc. 71 at 29.

Plaintiffs respond that the City is attempting to impose a rigorously heightened pleading standard when, in fact, Plaintiffs only need plead minimum factual allegations at this stage. Doc. 80 at 9. In response to Officer Mansell's motion, Plaintiffs argue that:

> [it] seems unlikely, given that the purpose of 9-1-1 is (in part) to allow the authorities to determine where the call originates, and the Plaintiffs have pleaded that Defendant Mansell would know the location of where the 9-1-1 call originated and the ethnicity of the "certain" residents living in the neighborhood based on the location of the 9-1-1 call. Finally, the tape of the 9-1-1 call identified Marjurita as a minority caller, describing a dispute DPD had a basis to categorize as a domestic dispute. At the time of the abduction, [D'Lisa], an African-American female, lived in a high crime and predominantly African-American neighborhood. Despite this, Defendant Mansell testified he spent just a minute on Marjurita's 9-1-1 call, and then moved on.

Doc. 81 at 17-18 (citations omitted).[6]

In their second amended complaint, Plaintiffs plead that Marjurita "provided facts" to Dominguez describing D'Lisa's call to her sister and "the imminent threat" that she faced, Doc.

---

[6] Throughout their response brief, including in the above-quoted passage, Plaintiffs cite to and quote at length from their First Amended Complaint rather than the operative complaint. *See* Doc. 81 at 5-8; Doc. 81 at 13-14, 16-18.

53 at 8, but Plaintiffs do not elaborate on what those "facts" were. First, Plaintiffs do not plead that Marjurita told Dominguez that either she or D'Lisa were a minority or that either of them were in a predominantly minority race neighborhood. The only specific facts that Plaintiffs allege are that Dominguez learned from Marjurita that D'Lisa's sister "had received an open line with D'lisa [sic] yelling/screaming." Doc. 53 at 8 n.1. Plaintiffs allege that Dominguez alerted Officer Mansell about the call, Doc. 53 at 9, but they do not state that Dominguez informed him about Marjurita's or D'Lisa's race, neighborhood, or the nature of the threat she was facing. Moreover, Plaintiffs plead only in conclusory terms that Dominguez herself had such knowledge.[7] Collins, 224 F.3d at 498 (the district court cannot "accept as true conclusory allegations or unwarranted deductions of fact."). Plaintiffs' argument that "it is unlikely" that Officer Mansell did not know where Marjurita's 9-1-1 call originated from, i.e., a predominantly minority neighborhood, is sheer speculation as they make no allegation whatsoever that Dominguez conveyed that information to him or any other information from which that fact could be gleaned, such as that Marjurita and D'Lisa were African-American. Nor is there any factual basis in the operative complaint to suggest that either Dominguez or Officer Mansell had any reason to believe that D'Lisa's situation was rooted in domestic violence.[8]

Additionally, while Plaintiffs plead that the City has a policy or custom of providing less assistance to victims in predominantly minority-race neighborhoods than to victims in other

---

[7] Specifically, Plaintiffs allege that "[a]t the time of [Marjurita's] call, [Dominguez] knew that [Marjurita] was calling from a socioeconomically deprived neighborhood and it was also obvious [to Dominguez] from listening to [Marjurita's] voice that she was a minority caller calling about what appeared to be a domestic violence dispute." Doc. 53 at 28.

[8] Plaintiffs merely allege that "[i]n response [to Dominguez's report of Marjurita's call], Officer Mansell made several statements regarding D'Lisa's age, race, and gender." Doc. 53 at 9.

neighborhoods, they do not specify where D'Lisa was at the time of the attack. Indeed, as the City points out, the very purpose of the ping attempts was to try to pinpoint D'Lisa's location. Plaintiffs' allegation that, "[a]t the time of the incidents alleged herein, D'Lisa resided in a high crime and predominantly minority-race neighborhood" is immaterial because they do not allege that she was attacked in her own neighborhood. For these reasons, Plaintiffs' facts, as pleaded, do not allow a reasonable inference of discrimination or discriminatory purpose to be drawn from either the City's or Officer Mansell's actions. As such, Plaintiffs' equal protection claims against them fail. That notwithstanding, in the interest of completeness and in light of the Court's recommendation that Plaintiffs be permitted to amend their complaint, the City's *Monell* arguments, made in opposition to Plaintiffs' claims that it has a custom, policy, or practice of engaging in race and gender discrimination under the facts alleged in this case, are addressed herein (*infra* at 18).[9]

### 2. Failure to Train

"A municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train." *Connick v. Thompson*, 563 U.S. 51, 61 (2011). Nevertheless, under certain circumstances, a municipality can be liable for a failure to train its employees. *See Conner v. Travis Cty.*, 209 F.3d 794, 796 (5th Cir. 2000). In such cases, the plaintiff must show that: (1) the municipality's training policy procedures were inadequate; (2) the municipality was deliberately indifferent in adopting its training policy; and (3) the inadequate training policy

---

[9] *Monell v. Dept. of Social Services of City of New York*, 436 U.S. 658 (1978).

directly caused the constitutional violation.[10] *Sanders-Burns v. City of Plano*, 594 F3d 366, 380 (5th Cir. 2010).

The failure to train must amount to "deliberate indifference to the rights of persons with whom the police come into contact." *City of Canton v. Harris*, 489 U.S. 378, 388 (1989). "'[D]eliberate indifference' is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Board of County Comm'rs v. Brown*, 520 U.S. 397, 410 (1997). Deliberate indifference can be demonstrated in two ways. *Davidson v. City of Stafford*, 848 F.3d 384, 397 (5th Cir. 2017). First, a plaintiff may demonstrate that the city had notice of a pattern of similar violations. *Id.* Second, a plaintiff may demonstrate liability based on a single incident if the constitutional violation was "the highly predictable consequence of a particular failure to train." *Id.* (internal quotation marks omitted).

In some cases, however, and in light of the duties assigned to specific officers or employees, "the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need." *Canton*, 489 U.S. at 390. In *Canton*, the Court noted that city policymakers definitively know that their police officers will be required to arrest fleeing felons and, therefore, the need to train officers in the constitutional limitations on the use of deadly force is "so obvious" that failure to do so could properly be characterized as "deliberate indifference" to constitutional rights. *Id.* at 390 n.10 (citation omitted).

---

[10] As set forth above, Plaintiffs have not yet pled a viable equal protection claim. However, given the Court's recommendation that Plaintiffs be granted leave to amend their complaint, they may be able to do so. Accordingly, the Court will address the remaining prongs of the failure to train test.

Plaintiffs allege in their complaint that the City failed and refused to implement adequate policies and failed to adequately train its personnel – in particular Officer Mansell and Dominguez − on the proper handling of 9-1-1 domestic violence calls from potential victims and/or family members which involve imminent danger.  Doc. 53 at 14-15, 24, 28.  They maintain that this failure to train reflects a deliberate indifference to the rights of the City's inhabitants.  Doc. 53 at 24.

The City moves to dismiss this claim, asserting that it is not viable as an initial matter because Plaintiffs failed to fail to plead any non-conclusory facts that permit a reasonable inference that any Plaintiff was denied equal protection of the law or that the City had a custom of discrimination or acted with deliberate indifference in failing to conduct sufficient training.[11] Doc. 70 at 26-31; Doc. 86 at 14.  Plaintiffs respond that, in this case, there was clearly a need for more training regarding how to handle domestic violence claims and, even if Plaintiffs did not adequately allege a custom of lack of training, section 1983 liability can attach here for a single decision not to train an individual officer.[12]

Based on the facts presented in the governing complaint, Plaintiffs have sufficiently pled that the City's 9-1-1 related training procedures were inadequate, and the City was deliberately indifferent in adopting its training policy.  Doc. 53 at 14-15, 24, 28.  First, Plaintiffs allege that

---

[11] The City cites only to Plaintiffs' due process failure-to-train averments, not the contentions they make with respect to their equal protection failure-to-train claim.  Doc. 70 at 27. Nevertheless, the allegations are similar enough that the Court will consider the City's argument on the merits.

[12] Plaintiffs suggest in their response that they raised failure to supervise and failure to discipline claims in the equal protection context, Doc. 80 at 30-31, but the operative complaint contains no such claims.

(1) on information and belief, previous City 9-1-1 operators have reported a lack of communication between the call takers, police dispatchers and police, Doc. 53 at 14; (2) at the time of D'Lisa's death, the City's 9-1-1 call center operated with, *inter alia*, inadequate training and unsatisfactory procedures relating to the proper handling of 9-1-1 calls, Doc. 53 at 14; (3) according to Chief Brown, officers respond to critical calls within six minutes, but it took several days for the police to finally respond to Marjurita's 9-1-1 call, Doc. 53 at 14; (4) a prior 9-1-1 operator has averred that she was taught by the City to have families of possible domestic violence victims contact jails and hospitals before police would be dispatched, Doc. 53 at 26-27; and (5) due to the lack of proper training, policies, and procedures, D'Lisa died, Doc. 53 at 29.

Second, Plaintiffs also have adequately pled that the City was deliberately indifferent to the need for better training. First, as discussed above, Plaintiffs have sufficiently pled at this stage of the case that the City had notice of a pattern of similar violations. *Davidson*, 848 F.3d at 397. Moreover, this case is similar to the *Canton* case insofar as the City policymakers here are on obvious notice that their 9-1-1 operators and supervising officers will be required to interact with callers reporting violent attacks, so the need to train them in the constitutional method of handling such calls is so obvious that not doing so can be characterized as deliberate indifference. 489 U.S. at 390 n.10. From these facts, the inference can reasonably be drawn that the City's conduct evidences "deliberate indifference to the rights of persons with whom the police come into contact." *Canton*, 489 U.S. at 388.

### D. Municipal Liability

A city does not automatically incur section 1983 liability for injuries caused solely by its employees, and it cannot be held liable under section 1983 on a *respondeat superior* theory. *Monell*, 436 U.S. at 691, 694; *Johnson v. Deep East Tex. Reg'l Narcotics*, 379 F.3d 293, 308 (5th

Cir. 2004).  Rather, to establish municipal liability under section 1983, a plaintiff must point to (1) a policymaker; (2) an official policy or custom; and (3) a violation of constitutional rights whose "moving force" is the policy or custom.[13]  *Monell*, 436 U.S. at 694.  Actual or constructive knowledge of the unconstitutional custom must be attributable to the municipality's governing body or to an official to whom policymaking authority has been delegated.  *Johnson*, 379 F.3d at 309.

While official policy normally is "contained in duly promulgated policy statements, ordinances, or regulations," it can arise from a "custom," which the Court of Appeals for the Fifth Circuit has defined as "a persistent, widespread practice of City officials or employees, which, although not authorized by officially adopted and promulgated policy, is so common and well-settled as to constitute a custom that fairly represents municipal policy."  *Webster v. City of Houston,* 735 F.2d 838, 841 (5th Cir. 1984).  While an unconstitutional official policy renders a municipality culpable under section 1983, "even a facially innocuous policy will support liability if it was promulgated with deliberate indifference to the 'known or obvious consequences' that constitutional violations would result."  *Piotrowski*, 237 F.3d at 579 (citation omitted).

To show that such a municipal policy or custom was the moving force behind the constitutional violations at issue, Plaintiffs must allege facts tending to show a direct causal link between the policy or custom and the alleged constitutional violations.  *Piotrowski*, 237 F.3d at 580; *see also Johnson*, 379 F.3d at 310 (there "must be more than a mere 'but for' coupling between cause and effect"; the policy "must be closely related to the ultimate injury" and have "actually caused" the constitutional violation complained of).  Finally, Plaintiffs must show

---

[13] The City does not directly argue that Plaintiffs have failed to adequately aver that there is a causal link between its alleged policy and the constitutional deprivations.

either (1) that the policy or custom itself violated federal law or authorized the deprivation of federal rights; or (2) "that the policy [or custom] was adopted or maintained by the municipality's policymakers with 'deliberate indifference' as to its known or obvious consequences." Johnson, 379 F.3d at 309 (quotation omitted).

### 1. Policymaker

As an initial matter, the City points out that Plaintiffs' second amended complaint lacks any reference to a specific policymaker. Doc. 70 at 25-26. The identification of a specific policymaker is not required, however, as that is a question of law, not fact, and a plaintiff is not required to single out a specific policymaker at the motion to dismiss stage. *Groden v. City of Dallas*, 826 F.3d 280, 285 (5th Cir. 2016).

### 2. Policy or Custom

The City contends that Plaintiffs fail to plead any facts that permit a reasonable inference that, beyond the incident at bar, there was a persistent, widespread practice of racial discrimination in the provision of police services. Doc. 70 at 24. The City asserts that the other alleged victims of such discrimination to whom Plaintiffs point − Cook and Crowe − do not support the inference of a persistent and widespread practice of discrimination in the City's provision of police services because (1) this Court has determined that Cook was not subjected to discrimination based on similar allegations, Doc. 70 at 24 (citing *Cook v. City of Dallas*, No. 3:12-CV-3788-P, 2015 WL 7352543, at *4 (N.D. Tex. Aug. 27, 2015)); and (2) Plaintiffs provide virtually no pertinent information as to Kelvin Crowe, other than that the location in question was "Southern Dallas" and the "Issue" was "911 calls unanswered," Doc. 70 at 24. The City maintains that Plaintiffs' conclusory allegations are insufficient to establish a "persistent and widespread practice having the force of municipal policy." Doc. 70 at 24-25.

Plaintiffs respond that they have adequately alleged that the City's customs take race and/or gender into consideration in determining what assistance or protection to provide to its citizens. Doc. 80 at 23. They attest that discovery will likely confirm the validity of their allegation that the City has engaged in the selective denial of police assistance, and they adequately alleged in their complaint that, *inter alia*, the City has a policy of providing less assistance to female domestic violence victims in "high crime and predominantly minority-race neighborhoods than to victims in other neighborhoods." Doc. 80 at 23-24, 27 (¶¶ 114, 132 of second amended complaint). Plaintiffs also point to a number of paragraphs in their complaint that allege, based on information and belief, the City directs money and police resources in a disproportionate manner so as to enhance the 9-1-1 infrastructure and provision of emergency services in "affluent and predominantly white neighborhoods" as opposed to predominately minority neighborhoods such as where D'Lisa and her family resided during the relevant time frame.[14] Doc. 80 at 23-24 (quoting ¶¶ 115-117 of the second amended complaint).

The complaint alleges that Marjurita called 9-1-1 from a predominately minority neighborhood, and her call was handled differently as a result of her race pursuant to City custom. Doc. 53 at 24-29. In support of this claim, Plaintiffs point to two other African-American people who lived in Southern Dallas who were affected by that alleged policy between August 2012 and January 2015. Doc. 53 at 26. Additionally, the complaint avers that Ms. Cook was a female victim of domestic abuse, as it alleges D'Lisa was, and the City has a custom of providing less support to such victims. Doc. 53 at 24-27.

---

[14] The City does not directly challenge Plaintiffs' allegations in this regard.

Similar allegations have been found sufficient to state a custom, policy, or practice for purposes of surviving a municipality's motion to dismiss. *Mack v. City of Abilene*, 461 F.3d 547, 556 (5th Cir. 2006) (finding that the plaintiff sufficiently alleged a policy/custom where he stated that the city inadequately supervised and trained its police officers, including those known to have engaged in misconduct and, as a result, the defendants believed their actions were not monitored and would not be investigated); *Buchanek v. City of Victoria*, No. V-08-08, 2008 WL 4093623, at *9-10 (S.D. Tex. 2008) (stating that "'[b]oilerplate' allegations of inadequate municipal policies or customs generally suffice"); *Allen v. City of Galveston*, No. G-06-467, 2007 WL 996628, at *2, 7 (S.D. Tex. 2007) (denying motion to dismiss where plaintiffs alleged "official policies, de facto policies, and/or customs that require police officers to show unqualified support for other officers" despite doubts whether plaintiffs could ultimately prevail); *Wayne v. City of San Antonio*, No. SA-06-cv-551-XR, 2006 WL 3487022, at *5 (W.D. Tex. 2006) (holding that a plaintiff's "boilerplate" language concerning the existence of a city's custom or practice "must survive" a motion to dismiss); *Batiste v. City of Beaumont*, 421 F.Supp.2d 969, 988 (E.D. Tex. 2005) (denying motion to dismiss where plaintiff's petition alleged a "pattern of widespread abuse . . . in the use of force generally, and taser guns in particular, against black citizens" even though the complaint was "devoid of specific factual allegations that support the claim"); *Jacobs v. Port Neches Police Dep't*, No. 94-cv-767, 1996 WL 363023, at *14 n.12 (E.D. Tex. 1996) (finding that, "in order to state a claim, a plaintiff must simply plead that the alleged constitutional violation was proximately caused by a policy or custom of the municipality and outline some of the facts of the particular harm at issue. Plaintiff need not specify at the pleading stage the proof on which he or she bases the claim that a municipal policy or custom was in existence."), *adopted by* 1997 WL 470354 (E.D. Tex. 1997);

*cf Allen v. Burnett*, No. 12-cv-4863-O, 2013 WL 2151218, *3 (N.D. Tex. 2013) (O'Connor, J.) (dismissing as frivolous a municipal liability claim when the plaintiff only alleged one improper police action, which was committed against him, in arguing that the police department had adopted an unconstitutional policy or custom). At this stage, Plaintiffs have adequately alleged that the City had a custom or policy of providing less assistance to domestic violence victims in high crime and predominantly minority-race neighborhoods than to other types of victims in other similarly situated neighborhoods.[15]

### E. Refusal to Provide Information (Request for Discovery of 9-1-1 Call)

Plaintiffs assert that the City is violating Texas statute by refusing to release the 9-1-1 tapes or the incident reports relating to the response to D'Lisa's home. Doc. 80 at 36-37 (citing Tex. Gov't Code § 552.221(a)). Plaintiffs contend that they need this information to establish additional evidence of the application of the customs and practices about which they complain. Doc. 80 at 37. The City responds that it has not violated Texas law and the matters about which Plaintiffs seek discovery fall outside the pleadings and should not be considered in the context of a Rule 12(b)(6) motion. Doc. 86 at 15.

The issue of whether the City has violated section 552.221(a) is not properly before this Court. The statutory scheme sets forth the procedures for persons seeking information to follow and the remedies permitted if the requested documents are not provided by the governmental

---

[15] While the City asserts that Plaintiffs additionally must allege that the municipal policymakers were deliberately indifferent to the "'known or obvious consequences' that constitutional violations would result" from the custom, that is only required where the complaint does not allege that the policy at issue is facially unconstitutional. *Piotrowski*, 237 F.3d at 579. Plaintiffs' complaint challenges the facial constitutionality of the City's custom and policy. *See* Doc. 53 at 24-27. The City does not directly argue that Plaintiffs have failed to adequately aver that there is a causal link between its alleged policy and the constitutional deprivations. *Piotrowski*, 237 F.3d at 580; *see also Johnson*, 379 F.3d at 310.

entity, including (1) filing a suit for writ of mandamus in the district court for the county in which the main offices of the governmental body are located or seeking declaratory or injunctive relief; and (2) filing a complaint with the district or county attorney of the county in which the governmental body is located unless the governmental body is the district or county attorney. TEX. GOV. CODE §§ 552.321, 552.3215.

### F. Plaintiffs' Request for Leave to Amend

Lastly, Plaintiffs request leave to file a third amended complaint if the Court grants the motions to dismiss. Doc. 80 at 38; Doc. 81 at 19. A court may dismiss a claim that fails to meet the pleading requirements, but "it should not do so without granting leave to amend, unless the defect is simply incurable or the plaintiff has failed to plead with particularity after repeated opportunities to do so." *Hart v. Bayer Corp*., 199 F.3d 239, 248 n.6 (5th Cir. 2000). Plaintiffs, who are represented by able counsel, already have amended their complaint twice, and their operative complaint includes only minimal conclusory allegations and facts that do not directly implicate the City or Officer Mansell in any legally cognizable wrongdoing, with the exception of their failure to train claim. Nevertheless, the City and Officer Mansell did not move to dismiss Plaintiffs' prior complaints and, therefore, Plaintiffs arguably were not on notice of the deficiencies in their complaint as described above at the time of their previous amendments. *See Brown v. Texas A & M Univ.*, 804 F.2d 327, 334 (5th Cir. 1986) ("Unless we have searched every nook and cranny of the record, like a hungry beggar searching a pantry for the last morsel of food, and have determined that 'even the most sympathetic reading of plaintiff's pleadings uncovers no theory and no facts that would subject the present defendants to liability,' we must remand to permit plaintiff to amend his claim if he can do so."). Thus, if this recommendation is

accepted, Plaintiffs should be given the opportunity to amend their complaint to correct, if possible, the deficiencies outlined herein.

## IV.  CONCLUSION

For the reasons stated, *The Defendant City of Dallas's Rule 12(b)(6) Motion to Dismiss the Plaintiffs' Federal Claims Against It in the Plaintiffs' Second Amended Complaint*, Doc. 70, and *The Defendant Kevin Mansell's Rule 12(b)(6) Motion to Dismiss the Plaintiffs' Federal Claims Against Him in the Plaintiffs' Second Amended Complaint*, Doc. 71, should be **GRANTED** to the extent stated herein.

**SO RECOMMENDED** on August 30, 2017.

RENEE HARRIS TOLIVER
UNITED STATES MAGISTRATE JUDGE

### INSTRUCTIONS FOR SERVICE AND
### NOTICE OF RIGHT TO APPEAL/OBJECT

A copy of this report and recommendation will be served on all parties in the manner provided by law.  Any party who objects to any part of this report and recommendation must file specific written objections within 14 days after being served with a copy.  *See* 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 72(b).  An objection must identify the specific finding or recommendation to which objection is made, state the basis for the objection, and specify the place in the magistrate judge's report and recommendation where the disputed determination is found.  An objection that merely incorporates by reference or refers to the briefing before the magistrate judge is not specific.  Failure to file specific written objections will bar the aggrieved party from appealing the factual findings and legal conclusions of the magistrate judge that are accepted or adopted by the district court, except upon grounds of plain error.  *See Douglass v. United Services Automobile Ass'n,* 79 F.3d 1415, 1417 (5th Cir. 1996), *modified by statute,* 28 U.S.C. § 636(b)(1) (extending the time to file objections from ten to fourteen days).

RENEE HARRIS TOLIVER
UNITED STATES MAGISTRATE JUDGE